## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

| | |
|---|---|
| In re:<br><br>Dawn L. Burnham,<br><br>      Debtor | Chapter 11<br>Case No. 20-10507 |
| Maine Circuit Breaker, Inc.,<br>et al.<br><br>      Plaintiffs<br>  v.<br>Dawn L. Burnham,<br><br>      Defendant | Adv. Proc. No. 21-1004 |
| In re:<br><br>Jason Kenneth Giacomuzzi,<br><br>      Debtor | Chapter 13<br>Case No. 20-20447 |
| Maine Circuit Breaker, Inc.,<br>et al.<br><br>      Plaintiffs<br>  v.<br>Jason Kenneth Giacomuzzi,<br><br>      Defendant | Adv. Proc. No. 21-2004 |

## MEMORANDUM OF DECISION

Maine Circuit Breaker, Inc. has sued two of its former employees, Dawn Burnham and

Jason Giacomuzzi, asking the Court to determine that the defendants are liable for debts in

specific amounts and, further, to determine that those debts are excepted from discharge. For the reasons explained below, partial summary judgment will enter in favor of Maine Circuit Breaker.

## BACKGROUND

Maine Circuit Breaker ("MCB") was in the business of buying circuit breakers and other electrical supplies and reselling them to distributors and other buyers. MCB's shareholders, Richard Phillips and Emma Leeman, were involved in the company's day-to-day operations in its earlier years but later phased out of active involvement.[1] In 2001, MCB hired Burnham as its bookkeeper. Several years later, Leeman ceased participating in the company's operations and, in 2008, Phillips retired from active management. At that point, Phillips turned management of MCB over to Wayne Dube, who became the company's general manager, and to Burnham, who became the company's purchasing agent for inventory. Both Burnham and Dube were granted check signing authority. At the time, the company had three other employees, including Jason Giacomuzzi, a salesperson.

In January 2013, while employed by MCB, Burnham, Giacomuzzi, and Dube created a limited liability company called B3 Supply, LLC. For years, they caused B3 to purchase electrical supplies and to sell those same supplies to MCB at a mark-up over B3's cost. From 2013 to 2018, more than 99% of B3's sales were to MCB. During this period, B3's gross profits were just over $1.4 million. Burnham, Giacomuzzi, and Dube took steps to keep B3 a secret from MCB's shareholders and other employees. The three used MCB's computers and instant messaging software to discuss B3's business during the MCB workday.

---

[1] Phillips, Leeman, and MCB were all named as plaintiffs in the complaints in these adversary proceedings. Later, the plaintiffs conceded that, if debts are owed by the defendants, those debts are owed to MCB, not to Phillips and Leeman individually. Consequently, relief will be awarded in favor of MCB only.

In the spring of 2018, Phillips began negotiating to sell MCB to Breakers Unlimited. Burnham, who had been instructed to assist Breakers with any due diligence requests, provided Breakers with vendor lists on two occasions, but intentionally omitted B3 from those lists. Months later, while evaluating a possible transaction with MCB, Breakers discovered certain discrepancies in MCB's financial records, uncovered the existence of B3, and informed Phillips and Leeman.

Around that same time, Burnham, Giacomuzzi, and Dube called a meeting with MCB's other employees and confessed that they had created B3 and had been buying inventory for B3 rather than MCB. They admitted that the B3 inventory had been shipped to Giacomuzzi's house, where it was repackaged and then shipped to MCB, so that the other MCB employees would remain in the dark about B3's activities. Burnham, Giacomuzzi, and Dube conceded that they had used their positions at MCB to cause MCB to purchase marked-up inventory from B3, and then pocketed the difference.

In October 2018, Dube and Giacomuzzi arrived unannounced at Phillips' and Leeman's home. Dube confessed the B3 scheme, and both Dube and Giacomuzzi pleaded for forgiveness. Phillips and Leeman were stunned; they had trusted Dube to manage the business honestly. After the confession, when Phillips encountered Burnham at MCB's office, Burnham apologized and asked whether she should "lawyer up." Phillips and Leeman informed Breakers of the confession and fired Burnham, Giacomuzzi, and Dube before the sale closed.

In addition to the B3 scheme, MCB focuses on the following cash withdrawals and checks written on MCB's operating account between 2012 and 2018 (collectively, the "Challenged Transactions"). First, checks totaling $7,775 were signed by Burnham and Dube and made payable to Alex Wren, an individual engaged to Dube's daughter. Second, checks

totaling $27,384 payable to "cash" were signed by Dube and endorsed by either Burnham or

Giacomuzzi.  Third, checks totaling $8,000 payable to Giacomuzzi were signed by Dube.

Fourth, checks totaling $24,343 payable to Burnham were signed by Dube.  Fifth, Burnham and

Dube made withdrawals from MCB's account totaling $7,200.  Finally, Burnham made

withdrawals from MCB's account totaling $9,400.  There are no supporting receipts, invoices, or

other documents establishing a legitimate business purpose for any of the Challenged

Transactions.

In 2020, Burnham, Giacomuzzi, and Dube each filed bankruptcy petitions, and MCB then

commenced adversary proceedings against each of the debtors.  In the proceeding against him,

Dube stipulated to a determination of nondischargeability and the entry of a money judgment in

the amount of $1 million.  *See* AP No. 20-1020 [Dkt. Nos. 16 & 21].  The proceedings against

Burnham and Giacomuzzi have been consolidated for purposes of summary judgment and trial.

MCB seeks summary judgment on all counts of the nearly identical complaints filed against

Burnham and Giacomuzzi.  By Count I, MCB seeks a determination that the defendants are each

liable for nondischargeable debts under 11 U.S.C. § 523(a)(2)(A).  Count II seeks a

determination of nondischargeability for those same debts under 11 U.S.C. § 523(a)(4).  In Count

III, MCB asks for a determination of nondischargeability under 11 U.S.C. § 523(a)(6).  MCB

agrees that there are two components of the alleged debts: (1) the gross profits of B3 attributable

to its sales to MCB, totaling $1,397,834 (the "Skimmed Profits"); and (2) the Challenged

Transactions.

### SUMMARY JUDGMENT AND THE FIFTH AMENDMENT PRIVILEGE

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

4

56(a).  When it comes to the facts, there is a burden shift on summary judgment.  "As to issues

on which the movant, at trial, would be obliged to carry the burden of proof, he initially must

proffer materials of evidentiary or quasi-evidentiary quality—say, affidavits or depositions—that

support his position."  Desmond v. Varrasso (In re Varrasso), 37 F.3d 760, 763 (1st Cir. 1994)

(footnote omitted).  If that initial burden is met, "the burden then shifts to the non-moving party

. . . to show that genuine issues of material fact exist."  Petrucelli v. D'Abrosca (In re

D'Abrosca), BAP No. RI 10-062, 2011 WL 4592338, at *4 (B.A.P. 1st Cir. Aug. 10, 2011)

(quotation marks omitted).  In reviewing the summary judgment record, "all reasonable

inferences from the facts must be drawn in the manner most favorable to the nonmovant."  In re

Varrasso, 37 F.3d at 763.  The court is not required to draw *all* inferences in favor of the party

opposing the motion; doing so would, at times, make a mockery of the process.  Instead, the

court's charge is to make all *reasonable* inferences in favor of the party opposing the motion.

When the facts "are capable of supporting *conflicting yet plausible inferences* . . . then the choice

between those inferences is not for the court on summary judgment."  Id. at 764 (emphasis

added).  "This means, of course, that summary judgment is inappropriate if inferences are

necessary for the judgment and those inferences are not mandated by the record."  Id. at 763.

   The defendants' opposition to summary judgment takes two forms.  First, they contend

that MCB is not entitled to judgment as a matter of law under section 523.  Second, the

defendants have claimed the Fifth Amendment privilege against self-incrimination in response to

each of MCB's statements of material fact, citing the possibility that criminal charges might, at

some point in the future, be brought against them.  The defendants made no attempt to controvert

any of the facts alleged by MCB in its motion; instead, they invoked the Fifth Amendment

broadly as to every single fact alleged.  The defendants suggest that this blanket invocation

should excuse their failure to controvert the facts alleged by MCB. In other words, the

defendants believe that they should not be held to their burden of disputing the facts alleged and

properly supported because to hold them to that burden would impermissibly interfere with the

exercise of their Fifth Amendment privilege. The defendants took a similar approach in

discovery, responding to each of MCB's requests for admission with an assertion of the Fifth

Amendment privilege.

> For its part, MCB contends that:

> [t]his Court may and should draw an adverse inference from both Defendants'
> invocation of the privilege against self-incrimination. *That inference being that
> had the Defendants responded to the Requests for Admissions, those responses
> would likely have supported [MCB's] position.* This inference, when added to the
> undisputed evidentiary showing of material facts by [MCB], is sufficient for this
> Court to grant summary judgment.

[Dkt. No. 29, p. 28] (emphasis added).

The Fifth Amendment privilege against self-incrimination "has always [been] broadly

construed . . . to assure that an individual is not compelled to produce evidence which later may

be used against him as an accused in a criminal action." Maness v. Meyers, 419 U.S. 449, 461

(1975). "This protection does not merely encompass evidence which may lead to criminal

conviction, but includes information which would furnish a link in the chain of evidence that

could lead to prosecution[.]" Id. The privilege "applies alike to civil and criminal proceedings,

wherever the answer might tend to subject to criminal responsibility him who gives it."

McCarthy v. Arndstein, 266 U.S. 34, 40 (1924).

> But while the assertion of the Fifth Amendment privilege against compulsory
> self-incrimination may be a valid ground upon which a witness . . . declines to
> answer questions, it has never been thought to be in itself a substitute for evidence
> that would assist in meeting a burden of production.

United States v. Rylander, 460 U.S. 752, 758 (1983). Adopting this view "would convert the privilege from the shield against compulsory self-incrimination which it was intended to be into a sword whereby a claimant asserting the privilege would be freed from adducing proof in support of a burden which would otherwise have been his." Id. This view has been rejected; a failure of proof on an issue where the defendant is assigned the burden of proof is not a form of "compulsion[.]" Id. Rylander undermines the defendants' argument that their invocation of the privilege should suspend the ordinary summary judgment framework and excuse their failure to dispute the facts alleged by MCB. Accord Serafino v. Hasbro, Inc., 82 F.3d 515, 518 (1st Cir. 1996) ("[I]n the civil context, where . . . the parties are on a somewhat equal footing, one party's assertion of his constitutional right should not obliterate another party's right to a fair proceeding.").

Although not expressly characterized as such, the defendants' opposition to summary judgment based on Fifth Amendment principles could be viewed as a renewal of their prior informal request to stay these proceedings until they receive some written assurance that they will not be prosecuted for the B3 Scheme or the Challenged Transactions. That prior request was denied and, to the extent that the defendants are renewing that request, the renewed request is also denied.

In evaluating a request for stay of a civil proceeding in the face of an actual or potential criminal proceeding, the court must balance competing interests, see Microfinancial, Inc. v. Premier Holidays Int'l, Inc., 385 F.3d 72, 78 (1st Cir. 2004), and here that balance tips decidedly in favor of MCB. The defendants' claims of Fifth Amendment hardship are undermined by their concession that they have not been criminally charged and may never be. Cf. id. at 79 (concluding that defendant failed to show acute Fifth Amendment dilemma where no criminal

charges had been brought and defendant did not inform the court of any "facts that might tend to suggest that an indictment was more than a remote possibility"). The defendants' claims are further eroded by their apparent failure to seek any form of immunity for evidence they might have provided in these proceedings and by the wholesale way in which they have claimed the privilege. *See* United States v. Castro, 129 F.3d 226, 229 (1st Cir. 1997) ("The privilege cannot be invoked on a blanket basis. It operates question by question.") (citation omitted). A review of the dockets of the underlying bankruptcy cases reveals that the defendants filed their petitions to stall a civil suit filed by, and to address the debts owed to, MCB. Under the circumstances, staying these proceedings—which turn on events that transpired years ago—would unfairly prejudice MCB. The defendants commenced their Title 11 cases voluntarily and, by doing that, forced MCB to choose between bringing these adversary proceedings or facing the prospect that its claims would be discharged. *See* 11 U.S.C. § 523(c)(1). Having made the choice to bring these proceedings, MCB was not precluded from also reporting the defendants' behavior to local law enforcement authorities. MCB is not handcuffed by the bankruptcy process in the way that the defendants believe.

Both parties cast their arguments about the Fifth Amendment in terms of an adverse inference. In a civil proceeding, a court may (but need not) draw an adverse inference against a party at trial based on that party's invocation of the Fifth Amendment. *See* Gannett v. Carp (In re Carp), 340 F.3d 15, 23 (1st Cir. 2003). "[W]hether a court can draw the same inference at the summary judgment stage, where all reasonable inferences must be drawn for the non-movant" is less clear. Marrama v. Citizens Bank of Mass. (In re Marrama), 445 F.3d 518, 522 (1st Cir. 2006). That said, the Court need not wade into any constitutional thicket to rule on the motion: the inference advocated by MCB (namely, that the defendants' discovery responses, had they

been provided, would have supported MCB's position) is not necessary to establish that the

Skimmed Profits gave rise to a nondischargeable debt. The evidence in the summary judgment

record—without any adverse inferences—is sufficient to support a determination of

nondischargeability as to the Skimmed Profits. As for the Challenged Transactions, even if the

Court made the inference requested by MCB, the record would not support a determination of

nondischargeability. MCB's requests for admission related to the Challenged Transactions

largely parrot its statements of material fact. By failing to dispute those statements, the

defendants effectively admitted them. *See* Fed. R. Civ. P. 56(e) ("If a party fails to . . . properly

address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the

fact undisputed for purposes of the motion[.]"); D. Me. Civ. R. 56(f) ("Facts contained in a

supporting . . . statement of material facts, if supported by record citations as required by this

rule, shall be deemed admitted unless properly controverted."). As such, the inference urged by

MCB does not significantly improve its case for entry of summary judgment. With or without

that inference, the record establishes only that there are no supporting receipts or documentation

to permit a determination that the Challenged Transactions were for legitimate purposes. That

alone is too slender a reed upon which to pin a determination of nondischargeability.

## LIABILITY

By asking the Court to enter money judgments for debts that are presently disputed and

unliquidated, MCB has effectively sought a determination of the validity and amount of its

claims against the defendants. This aspect of the analysis logically precedes any discussion of

whether the debts fall within 11 U.S.C. §§ 523(a)(2)(A), (a)(4), or (a)(6). If the defendants are

not liable to MCB, there is no need to determine the scope of the discharge.

The validity of a creditor's claim is determined by nonbankruptcy law. <u>Grogan v.
Garner</u>, 498 U.S. 279, 283 & n.9 (1991). Yet neither of the parties briefed the issue of
defendants' liability under Maine law. For its part, MCB referred to state law only in briefing
the separate issue of nondischargeability.[2] Nevertheless, the record establishes that the
defendants wronged MCB, and Maine law would provide a remedy for that wrongful conduct.
Liability is appropriately imposed for torts of two varieties: breach of fiduciary duty and
fraudulent concealment.

Fiduciary relations take many forms, including that of agency—a "relation which results
from the manifestation of consent by one person to another that the other shall act on his behalf
and subject to his control, and consent by the other to so act." <u>Desfosses v. Notis</u>, 333 A.2d 83,
86 (Me. 1975) (citing the Restatement (Second) of Agency § 1(1) (1957)). In all matters
connected with his agency, an agent must "act with utmost faith and loyalty and disclose all facts
within his knowledge which bear materially upon his principal's interest." <u>Id</u>. at 87. An agent is
also dutybound to "take no unfair advantage of his position in the use of information or things
acquired by him because of his position as an agent or because of the opportunities which his
position affords." Restatement (Second) of Agency § 387 cmt. b (1958). Unless the principal
otherwise agrees, an agent may not "deal with his principal as an adverse party in a transaction
connected with his agency[.]" <u>Id.</u> § 389.

An agent who breaches his duty as a fiduciary by using the principal's property for his
own purposes "is subject to liability to the principal for the value of the use." <u>Desfosses</u>, 333
A.2d at 87 (citing Restatement (Second) of Agency § 404). When a fiduciary uses assets

---

[2] For example, MCB refers to Maine law in its efforts to define the contours of a "fiduciary capacity"
for purposes of section 523(a)(4). While there may be similarities between section 523(a)(4) and Maine
law concerning fiduciary relationships, the scope of section 523(a)(4) is determined by reference to
federal law. *See* <u>Raso v. Fahey (In re Fahey)</u>, 482 B.R. 678, 688 (B.A.P. 1st Cir. 2012).

entrusted to him to obtain property for the principal while retaining a portion of those assets for

his own benefit, in violation of his duty of loyalty and fair dealing, he "is liable to his principal

for secret profits,"—i.e., the funds "wrongfully retained after the purpose of the agency was

accomplished." Id. at 88.  In that case, the measure of the principal's damage is the agent's

profits, consisting of the funds of the principal wrongfully retained by the agent.  Id.

> Turning to the separate tort of fraudulent concealment, its elements consist of:
>
> (1) a failure to disclose; (2) a material fact; (3) where a legal or equitable duty to disclose exists; (4) with the intention of inducing another to act or to refrain from acting in reliance on the non-disclosure; and (5) which is in fact relied upon to the aggrieved party's detriment.

Picher v. Roman Catholic Bishop of Portland, 974 A.2d 286, 295 (Me. 2009).

Here, the undisputed facts reveal that the defendants, as employees of MCB, were agents

of MCB authorized to act on its behalf in certain respects.  The defendants, while serving as

employees of MCB, failed to disclose the material fact that they were buying inventory at market

prices for B3 then selling that inventory at a mark-up to MCB, where the defendants'

employment relationship with MCB imposed a duty to disclose the fact.  The defendants kept the

existence of B3 a secret so that MCB would continue paying those marked-up prices.  And MCB

justifiably relied on the defendants' nondisclosure and continued paying B3 more for inventory

than it otherwise would have.  These facts amount to both breach of fiduciary duty and

fraudulent concealment.

The defendants committed tortious conduct under Maine law and are liable for all

damages that are the "natural and probable consequences" of that conduct.  See Gagnon v.

Turgeon, 271 A.2d 634, 635 (Me. 1970).  But for the B3 scheme, MCB would have paid

approximately $1.4 million less for inventory between 2013 and 2018; B3's gross profits

attributable to its sales to MCB during this timeframe are equal to the damages that MCB

suffered as a result of the defendants' wrongful conduct. Burnham and Giacomuzzi are liable, jointly and severally, for these damages in the amount of $1,397,834. *See* Restatement (Second) of Torts § 876 (providing that liability for damages caused by the activity of those engaged in concerted action is generally imposed on each of the participants).

According to the defendants, MCB is not entitled to damages in an amount equal to the Skimmed Profits because MCB has not shown that B3's inventory purchases were made by the defendants while they were employed by MCB and, further, while they were on MCB's "clock," so to speak. There are at least two problems with this argument. First, the record establishes that the defendants used MCB's resources to discuss B3's business during the MCB workday, and it strains credulity to imagine that they did not also conduct any of B3's business during the MCB workday. Second—and more fundamentally—the defendants' argument overlooks one of the most basic duties of an employee: the duty to act in good faith toward the furtherance of the employer's legitimate goals. *See* Dirigo Housing Assocs., Inc. v. Crowley, No. Civ. A CV-03-156, 2003 WL 22309103, at *5 (Me. Super. Ct. Sept. 24, 2003) ("[T]he employee owes his or her employer a fiduciary duty. That duty is founded upon a covenant of good faith and fair dealing requiring that the parties not conduct any activities that will injure the right of the other to receive the benefits of their employment agreement."). If a corporate opportunity arises, an employee is required to make that opportunity available to the employer. *See* Restatement (Third) of Agency § 8.02 cmt. d (2006) (explaining that all agents "have a fiduciary duty to the principal not to take personal advantage of an opportunity . . . when either the nature of the opportunity or the circumstances under which the agent learned of it require that the agent offer the opportunity to the principal"). The employee cannot learn of the opportunity and then wait

until the employee is off the proverbial clock only to usurp the opportunity for himself to the

detriment of the employer.  The defendants' argument to the contrary is not persuasive.

## NONDISCHARGEABILITY

A creditor seeking to establish that a debt falls within 11 U.S.C. § 523(a) bears the

burden of proving nondischargeability by a preponderance of the evidence.  Grogan, 498 U.S. at

287.  The dischargeability of a debt is "a matter of federal law governed by the terms of the

Bankruptcy Code" separate and apart from the validity of the debt under nonbankruptcy law.  Id.

at 284.  In determining whether MCB is entitled to judgment as a matter of law, the Court will

first address the dischargeability of the portion of MCB's claim relating to the Skimmed Profits,

and then separately address the Challenged Transactions.

### I.    The Skimmed Profits and Section 523(a)(4)

MCB places the most emphasis on Count II, which consists of its request for relief under

section 523(a)(4).  That statute provides that a discharge under 11 U.S.C. § 1192—the type of

discharge available in Burnham's case—or 11 U.S.C. § 1328—the type of discharge available to

Giacomuzzi—"does not discharge an individual debtor from any debt . . . for fraud or defalcation

while acting in a fiduciary capacity, embezzlement, or larceny[.]"  11 U.S.C. § 523(a)(4).  The

statute renders three separate types of debt nondischargeable: debts for fraud or defalcation in a

fiduciary capacity, debts for embezzlement, and debts for larceny.  MCB trains its sights on the

first category of debt—one arising out of fraud or defalcation in a fiduciary capacity—while

mentioning the second and third only in passing.  Fiduciary capacity for purposes of section

523(a)(4) exists only where there is an express or technical trust.  Andrade v. Hill (In re Hill),

610 B.R. 154, 162 (Bankr. D. Me. 2019).  Although there is no express trust in this case, there

could be an argument that a technical trust existed under the common law.  But that argument

has not been made explicitly here, and it has been rejected by at least one other court.  *See* <u>Grow
Up Japan, Inc. v. Yoshida (In re Yoshida)</u>, 435 B.R. 102, 109 (Bankr. E.D.N.Y. 2010)
(concluding that an employment relationship, by itself, does not constitute a fiduciary
relationship under section 523(a)(4)).  Here, there is no need to determine the extent to which
Maine agency law overlaps with the federal standard for fiduciary capacity because—as to the
Skimmed Profits—the other statutory categories of misconduct are established by the undisputed
facts.

In this context, embezzlement is "the fraudulent conversion of the property of another by
one who is already in lawful possession of it."  <u>Sherman v. Potapov (In re Sherman)</u>, 603 F.3d
11, 13 (1st Cir. 2010) (quotation marks omitted).  "To constitute embezzlement, conversion must
be committed by a perpetrator with fraudulent intent.  The essence of the concept is the knowing
use of entrusted property for an unauthorized purpose."  <u>In re Hill</u>, 610 B.R. at 160 (quotation
marks and citations omitted).  Where "a debtor uses entrusted funds for his own purposes, with
knowledge such use is unauthorized, fraudulent intent is manifest, rendering a conversion
fraudulent and therefore an embezzlement."  <u>Id.</u>  "Larceny does not differ from embezzlement
except with respect to the manner in which the funds or property come into possession of [the
perpetrator]."  <u>Great Am. Ins. Co. v. Graziano (In re Graziano)</u>, 35 B.R. 589, 594 (Bankr.
E.D.N.Y. 1983); *see also* <u>McCallion v. Lane (In re Lane)</u>, 937 F.2d 694, 697 n.6 (1st Cir. 1991)
(employing <u>Graziano</u>'s definition of larceny).  Larceny is the fraudulent taking of the property of
another "with intent to convert such property to the taker's use *without consent of the owner*."  <u>In
re Graziano</u>, 35 B.R. at 594 (emphasis added).

Here, the Skimmed Profits were funds fraudulently obtained from MCB by Burnham,
Giacomuzzi, and Dube by way of the B3 scheme.  But Burnham's misappropriation of MCB's

funds differed from Giacomuzzi's in an important respect:  Burnham had MCB's consent to spend corporate funds on inventory, and her malfeasance took place after MCB's funds were entrusted to her care.  There is no evidence in the record that Giacomuzzi was vested with authority over MCB's checkbook or inventory purchasing.  His participation in the scheme by which he appropriated MCB's funds for the benefit of B3 lacked any veneer of propriety.

As MCB's bookkeeper and purchasing agent, Burnham was entrusted with authority to use MCB's funds to purchase inventory in the ordinary course of business.  Between 2013 and 2018, she bought inventory for B3 knowing that the inventory would be sold to MCB at inflated prices.  She then caused MCB to purchase that inventory from B3, and split B3's profits with Giacomuzzi and Dube.  All the while, Burnham participated in efforts to conceal the B3 scheme from MCB's shareholders and its other employees.  Burnham put the funds of her employer, MCB, to her own unauthorized uses to the detriment of MCB.  She did so with knowledge that such use was unauthorized—and therefore with fraudulent intent—as demonstrated by her concealment of the scheme, by her omission of B3 from the vendor lists supplied to Breakers, and by her apology to Phillips after the B3 scheme was uncovered.  *See* Whitcomb v. Smith, 572 B.R. 1, 16 (B.A.P. 1st Cir. 2017) ("Because the intent to defraud is rarely proven by direct evidence, courts assess this element using a totality of the circumstances approach to discern the debtor's subjective intent."); In re Marrama, 445 F.3d at 522 ("Evidence of fraud is conclusive enough to support summary judgment . . . when it yields no plausible conclusion but that the debtor's intent was fraudulent.").  In short, Burnham's actions in furtherance of the B3 scheme amount to embezzlement within the meaning of section 523(a)(4).  *Cf.* LaPointe v. Brown (In re Brown), 131 B.R. 900, 906 & n.12 (Bankr. D. Me. 1991) (concluding that person entrusted with control over timber on corporate lands engaged in embezzlement by appropriating to himself

stumpage payment that was rightfully the corporation's); In re Sherman, 603 F.3d at 13-15

(affirming determination that corporate principal engaged in embezzlement where he participated

in a rebilling maneuver, appropriating client funds to keep the corporate doors open, to his own

benefit, and without authority from the affected clients); see also T Street LLC v. Jacques (In re

Jacques), 615 B.R. 608, 638 (Bankr. D. Idaho 2020) (concluding that debtor committed

embezzlement by using rents and security deposits entrusted to him, for unauthorized purposes,

under circumstances establishing fraud); Damian Mfg. Co. v. Corwin (In re Corwin), 76 B.R.

221, 223 (Bankr. S.D. Fla. 1987) (concluding that purchasing agent who agreed to buy

equipment at cost for manufacturer committed embezzlement by inflating invoices submitted to

manufacturer and fraudulently appropriating for his own use manufacturer's money).

Because Giacomuzzi did not have the same authority over MCB's funds, he is not

similarly liable for a nondischargeable debt for embezzlement.  Giacomuzzi was involved with

sales.  The record does not suggest that he had check writing authority or that he was empowered

to make inventory purchases on MCB's behalf.  In the absence of that authority, his actions in

furtherance of the B3 scheme do not amount to embezzlement.[3]  Those actions do, however,

amount to larceny—the fraudulent conversion of MCB's property without any authority to

exercise control over that property.  Along with Burnham and Dube, Giacomuzzi created B3,

purchased inventory for B3 and sold it to MCB at a mark-up and pocketed the difference, and

took steps to keep the existence of B3 a secret, including having B3 packages shipped to his

home where they were repackaged and shipped to MCB.  His efforts to keep the scheme a secret,

his confession to his coworkers, and his request for forgiveness from Phillips all show that

---

[3]  MCB has not argued that Giacomuzzi may be held liable for embezzlement as a result of conspiring
with, or aiding and abetting, Burnham or Dube.

16

Giacomuzzi was aware that the B3 scheme was unauthorized and wrongful. His actions in furtherance of the B3 scheme constitute larceny under section 523(a)(4).

## II.     The Skimmed Profits and Section 523(a)(2)(A)

In Count I of the complaints, MCB seeks a determination of nondischargeability under section 523(a)(2)(A). That statute bars discharge of "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" 11 U.S.C. § 523(a)(2)(A). "An action under § 523(a)(2)(A) involves three distinct categories of misconduct—false pretenses, false representation, or actual fraud—albeit with elements that overlap." Privitera v. Curran (In re Curran), 554 B.R. 272, 284 (B.A.P. 1st Cir. 2016).

MCB claims that the defendants obtained money, in the form of the Skimmed Profits, by false pretenses, false representation, and actual fraud. Specifically, MCB contends that the defendants' failure to disclose the B3 scheme qualifies as a misrepresentation under Maine law and section 523(a)(2)(A). Despite this invitation, it is unnecessary to parse the extent to which Maine principles of misrepresentation cohere with the elements of a false representation under section 523(a)(2)(A). The third category of misconduct targeted by the statute—actual fraud—is more straightforward in its application here.

Actual fraud in section 523(a)(2)(A) includes forms of fraud "that can be effected without a false representation." Husky Int'l Elecs., Inc. v. Ritz, 578 U.S. 356, 359 (2016). "[A]nything that counts as 'fraud' and is done with wrongful intent is 'actual fraud.'" Id. at 360. "Although 'fraud' connotes deception or trickery generally, the term is difficult to define more precisely." Id. The "generic term has frequently been used to embrace[] all the multifarious means which

human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth." Sauer Inc. v. Lawson (In re Lawson), 791 F.3d 214, 219 (1st Cir. 2015) (quotation marks omitted).

By engaging in the B3 scheme, Burnham and Giacomuzzi committed actual fraud within the meaning of section 523(a)(2)(A). This form of fraud does not necessarily require a misrepresentation or reliance by the affected creditor. *See* Ritz, 578 U.S. at 359, 365. Instead, fraud is established here by MCB's showing that Burnham and Giacomuzzi created a shell company, B3, for the sole purpose of skimming profits that would have otherwise gone to MCB and diverting those profits to their own advantage. Their efforts to keep the scheme a secret reveal that they maintained the requisite wrongful and deceptive intent. Burnham and Giacomuzzi obtained money, in the form of the Skimmed Profits, by their fraud, and this gave rise to a nondischargeable debt equal to the Skimmed Profits.

## III.    The Skimmed Profits and Section 523(a)(6)

Finally, in Count III of the complaints, MCB seeks a determination of nondischargeability under section 523(a)(6). The statute bars discharge of "any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6). An injury qualifies as "malicious" in this context if the injury was "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." Printy v. Dean Witter Reynolds, Inc., 110 F.3d 853, 859 (1st Cir. 1997) (quotation marks omitted). "The word 'willful' in (a)(6) [also] modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998). The "(a)(6) formulation triggers in the lawyer's mind . . . intentional torts, as distinguished from negligent or reckless

torts.  Intentional torts generally require that the actor intend the *consequences* of an act, not

simply the act itself."  Id. at 61-62 (quotation marks omitted).

Here, as has already been observed, the defendants converted MCB's funds to their own

uses with fraudulent intent by buying inventory for B3 at low prices, marking it up, and then

selling that inventory to MCB and pocketing the difference.  The undisputed facts do not permit

any reasonable inference that the defendants maintained some justification or excuse for this

scheme.  The record also makes clear that the defendants intended to profit from their scheme, at

MCB's expense.  The appropriation of a corporate opportunity to buy inventory at market prices,

and the diversion of MCB's funds to the inventory purchased for, and marked up by, B3 was not

innocent, as demonstrated by the defendants' efforts to keep the scheme a secret.  Moreover, the

defendants' conduct could not be fairly characterized as merely negligent or reckless; it was

calculated and intentional.  Perhaps some plausible but conflicting inference might be drawn in

the defendants' favor if there was evidence that B3 had been formed for a legitimate purpose,

had other customers, and had engaged in a competitive business with MCB's knowledge and

consent.  But the record reveals nothing of the sort.  By causing MCB to pay more for inventory

than it otherwise would have, pocketing that mark-up, and keeping their employer in the dark

about the scheme, Burnham and Giacomuzzi willfully and maliciously injured MCB within the

meaning of section 523(a)(6).  *Cf.* Printy, 110 F.3d at 859-60 ("Printy took advantage of Dean

Witter's computer error by borrowing against and withdrawing funds from the false margin

account that derived its value from shares of stock that Printy knew he did not own.  Such

conduct by Printy translates easily into an intent to willfully and maliciously cause harm.").

With respect to the Skimmed Profits, the same conduct supporting a determination of

nondischargeability under section 523(a)(4) and (a)(2)(A) warrants a judgment of

nondischargeability under section 523(a)(6).  *See* id. at 858 (holding that "sections 523(a)(2)(A) and (a)(6) are not mutually exclusive").

### IV.     The Challenged Transactions

Turning to the Challenged Transactions, the record does not permit a determination that all, or some portion of, those transactions were in fact for unauthorized purposes or otherwise undertaken in fraudulent or wrongful manner, as would be required to support a judgment of nondischargeability under the parts of section 523(a) invoked by MCB.  The record reveals only that there is no supporting documentation such that a legitimate purpose for the withdrawals can be determined at this point.  It does not follow that some or all of the withdrawals were, in fact, illegitimate.  For example, it is possible that Alex Wren provided some services to MCB and, as a result, was entitled to compensation, notwithstanding his relationship with Dube's daughter. Of course, he may have received payment from MCB for no legitimate purpose.  The record does not compel a conclusion either way.  As for the cash withdrawals and the checks, it is not unreasonable to imagine that MCB transacted some amount of business on a cash basis. Employees sometimes pay corporate expenses out of their own pockets and then seek reimbursement from the employer.  Admittedly, the number and dollar value of the transactions, when coupled with the B3 scheme, casts serious doubt on the notion that all of the Challenged Transactions were legitimate.  But, given the procedural posture, all reasonable inferences about the Challenged Transactions must be made in favor of the defendants.  In short, MCB has not

shown, on this record, that the Challenged Withdrawals gave rise to a nondischargeable debt.[4]

## CONCLUSION

The material facts are not genuinely in dispute, and MCB is entitled to judgment as a matter of law on its complaints for a determination that Burnham and Giacomuzzi are liable for a nondischargeable debt in the amount of $1,397,834 under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).[5]  Summary judgment will therefore be granted in part.

Dated: December 23, 2021

_____
Michael A. Fagone
United States Bankruptcy Judge
District of Maine

---

[4]  MCB might protest that it has done all that it could in terms of uncovering these transactions and that the defendants should now, in fairness, bear the burden of establishing that there were legitimate reasons for the Challenged Transactions.  In a general sense, MCB might be right about this.  But MCB invoked the summary judgment machinery—which limits the inferences that can be made—instead of proceeding to trial—where adverse inferences could be drawn against the defendants even if they continued to assert the Fifth Amendment.

[5]  The defendants contend that judicial estoppel prohibits MCB from seeking a money judgment in an amount greater than MCB's allowed claim of $214,375 included in Burnham's confirmed chapter 11 plan.  This is so, they say, because MCB did not object to confirmation of that plan.  MCB also invokes judicial estoppel, but for a different reason:  it avers that Burnham should be estopped from denying that fraud took place because her plan allowed MCB's claim (albeit in a reduced amount) which had as its stated basis "damages for fraud and theft."  These arguments are rejected because they improperly conflate claims allowance, treatment of claims under confirmed plans, and dischargeability.  Beyond that, the Court has discretion in wielding the doctrine as a procedural bar, and the circumstances here do not warrant application of the doctrine.  *See* New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001) (enumerating factors that typically inform a decision to apply judicial estoppel).  This is particularly true where objections to MCB's claims were overruled without prejudice to the determinations to be made in these adversary proceedings.